**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | |
|---|---|
| FINANCIAL HORIZONS CREDIT UNION, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br>v.<br><br>EVOLVE BANK & TRUST,<br><br>               Defendant. | Case No. 4:26CV206-LPR<br><br>**DEMAND FOR JURY TRIAL**<br><br>**FILED**<br>U.S. DISTRICT COURT<br>EASTERN DISTRICT ARKANSAS<br><br>FEB 2 5 2026<br><br>TAMMY H. DOWNS, CLERK<br>By:_____<br>DEP CLERK |

## CLASS ACTION COMPLAINT

Financial Institution Plaintiff Financial Horizons Credit Union ("Plaintiff"), individually and on behalf of the Class (defined below), based on personal knowledge as to itself and its own acts, on information and belief where indicated, and upon investigation of counsel as to all other matters, bring this putative class action against Defendant Evolve Bank & Trust ("Evolve" or "Defendant") and alleges as follows:

### INTRODUCTION

1.    Plaintiff brings this class action on behalf of a class of financial institutions that suffered, and continue to suffer, harm as a direct result of Evolve's failure to take adequate and reasonable measures to protect Plaintiff's and other financial institutions' financial data.

2.    Evolve is a state chartered  financial institution that provides open banking and banking-as-a-service ("BaaS") services to third party financial organizations.[1]  Open banking relies on technology, including application programming interfaces ("APIs"), that enable secure

---

[1]  *About Us*, EVOLVE BANK & TRUST, https://www. https://www.getevolved.com/about/ (last accessed February 11, 2026).

This case assigned to District Judge _Rudofsky_
and to Magistrate Judge _Volpe_

communication between the software systems of different service providers.[2]  BaaS is a subset of open banking and refers to the products and services that regulated financial institutions make available to financial and non-financial companies to enable the provision of banking services.[3] Through BaaS arrangements, third-party companies are granted access to the banking functionality of a regulated bank, while the bank remains responsible for the underlying banking operations and applicable regulatory and compliance obligations.[4]  Open banking and BaaS enable secure data access and financial products, including the issuance of debit and credit cards in digital, physical, or combined form.[5]

3.      Due to the nature of its business, Evolve knowingly collects, processes, and stores large quantities of sensitive financial information.  Consequently, Evolve owed an explicit duty to Plaintiff and the Class to adequately secure such information from unauthorized access and exfiltration.

4.      Despite its obligations under industry standards, including the Payment Card Industry Data Security Standards ("PCI DSS") and Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, Evolve failed to adequately safeguard Plaintiff's customers' PCD, directly resulting in the Data Breach.

5.      On or about July 1, 2024, Evolve publicly acknowledged that its systems were compromised in a ransomware attack carried out by a threat actor known as LockBit.[6]  Evolve

---

[2]      *How We Work*, EVOLVE BANK & TRUST, https://www.getevolved.com/open-banking/how-we-work/ (last accessed February 12, 2026).
[3]      *Id.*
[4]      *Id.*
[5]      *Id.*
[6]      *Cybersecurity          Incident*,     EVOLVE        BANK        &        TRUST, https://www.getevolved.com/cybersecurity-incident/ (last accessed February 11, 2026); *see also Substitute    Notice    of    Data    Breach*,    EVOLVE    BANK    &    TRUST, https://www.getevolved.com/substitute-notice-of-data-breach/ (June 30, 2025).

admitted that the attackers gained access to Evolve's systems. Evolve further stated that the access may have enabled the threat actor to access and exfiltrate consumer information between February and May of 2024.[7]

6.    Evolve further stated that customer names, Social Security numbers, bank account numbers, dates of birth, and contact information were affected for most of their personal, mortgage, trust, and small business banking customers, as well as customers of their Open Banking partners. Additionally, Evolve stated that a portion of these individuals also had their debit card number exposed, and that the affected files also included ACH transaction records, which include financial account number, routing number, and name for both payors and payees.[8]

7.    Evolve's negligent actions exposed highly sensitive Payment Card Data ("PCD"), including Primary Account Numbers ("PANs"), financial account numbers, and routing numbers belonging to millions of banking customers. Evolve's inadequate data security measures exposed this valuable information to hackers for over three years, between November 5, 2021, and May 31, 2024 (the "Data Breach").

8.    In September 2024, Visa Inc. ("Visa") issued a Proactive Compromised Account Management System ("CAMS") alert to Plaintiff identifying Evolve as the affected entity and stating that Primary Account Numbers ("PANs") were at risk due to a suspected network intrusion. The alert identified an exposure window spanning from *November 5, 2021, through May 31, 2024*, which exceeded the timeframe publicly reported by Evolve.

9.    In June 2025, Visa issued a follow-up CAMS alert to Plaintiff confirming that the incident involved a verified network intrusion resulting in unauthorized access to customer data.

---

[7]    *Id.*
[8]    *Id.*

3

Visa confirmed that PAN data associated with transactions conducted during *November 5, 2021,*
*through May 31, 2024,* had been compromised.

10.     As a direct consequence of the Data Breach, Plaintiff and the Class have incurred
significant damages, including, but not limited to: significant costs incurred from cancelling and
reissuing compromised payment cards, expenses relating to increased customer service and
additional fraud detection and monitoring efforts, and enduring substantial operational and
reputational harm.

11.     Moreover, as a direct and proximate result of Evolve's negligence, Plaintiff's and
its customers' PCD is now readily available to cybercriminals and has been actively trafficked on
illicit dark web marketplaces, substantially increasing the risk of ongoing and future fraud.

12.     The risk of future harm remains real and imminent.  Plaintiff and the Class face an
ongoing threat of fraudulent payment card activity, banking fraud, and reputational harm.  These
risks will persist as long as the stolen PCD remains in the hands of cybercriminals, requiring
Plaintiff and the Class to incur continued costs to reduce and mitigate these risks.

13.     Unlike industry leaders that respond to similar breaches by immediately
implementing corrective measures and adopting heightened security standards such as multi-factor
authentication and penetration testing.  To date, it has not been confirmed that the stolen data has
been securely recovered or destroyed.

14.     Despite the severity of the breach, Evolve failed to provide adequate and timely
notification to affected institutions and failed to disclose specific details about the vulnerabilities
exploited, measures taken to rectify security shortcomings, and assurances that stolen data had
been secured or destroyed.

15.    Evolve's management consciously disregarded specific warnings and known risks associated with its deficient data security infrastructure, thus facilitating the unauthorized access and exfiltration of highly sensitive PCD affecting millions of individuals and their payment card issuers. This Data Breach represents a significant incident with substantial negative implications for the financial institutions forced to address the fallout.

16.    Evolve fully understood its duties to protect the confidentiality, accuracy, and integrity of PCD. Evolve understood that a data breach was a foreseeable and legitimate risk, and that if such an event occurred, the consequences for financial institutions would be severe. Yet, Evolve failed to implement basic, industry-standard data security measures that would have protected PCD.

17.    Evolve was on heightened notice of the risks of payment card data breaches and the consequences of deficient cybersecurity practices. Specifically, as an entity whose business offers products and services designed to support payment card programs through its open banking and BaaS services, Evolve knew or should have known that such PCD possess a heightened risk of theft by cybercriminals.

18.    Publicly available guidance from the Federal Trade Commission ("FTC") and the Payment Card Industry Security Standards Council, including PCI DSS standards, put Evolve on clear notice of its duty to implement robust cybersecurity protocols.

19.    Moreover, on June 11, 2024, just days before the Data Breach, the Federal Reserve

Board issued an enforcement action against Evolve for deficiencies in its risk management, anti-

money laundering, and consumer compliance practices.[9]  Though public filings do not make clear

the failures identified by the Federal Reserve, the June 11, 2024 Order specifically required

Defendant to "submit a written plan . . . including timetables, to correct the information technology

and information security deficiencies identified in [examination reports completed by the Federal

Reserve in August 2023 and January 2024]."[10]

20.    The Data Breach was a direct and proximate result of Evolve's decision to disregard

recommended cybersecurity measures.  These decisions left the PCD of Plaintiff's customers

unencrypted, unsegregated, and fully accessible to cybercriminals, who were able to exfiltrate

sensitive payment information.

21.    Plaintiff, individually and on behalf of a nationwide class of similarly situated

financial institutions, seeks both monetary and injunctive relief.  Plaintiff asserts claims for

negligence, including negligence *per se* under the FTC Act and industry standards such as PCI

DSS.  Plaintiff also seeks declaratory relief requiring Evolve to implement comprehensive

cybersecurity measures in line with industry best practices to ensure this breach is not repeated.

## PARTIES

22.    Plaintiff Financial Horizons Credit Union is a state-chartered credit union with a

principal place of business in Hawthorne, Nevada.  Beginning on or around September 19, 2024,

---

[9]      *In the Matter of Evolve Bancorp Inc. and Evolve Bank & Trust*, Cease and Desist Order
Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, Dkt. Nos. 24-012-B-HC &
24-012-B-SM,
https://www.federalreserve.gov/newsevents/pressreleases/files/enf20240614a1.pdf (June 11,
2024)
[10]      *Id.* at 10, ¶6.

and again on June 10, 2025, Visa issued CAMS alerts to Plaintiff, indicating that PCD, including PAN data had been exposed in the Data Breach. PAN is a unique payment card number (credit, debit, or prepaid cards, etc.) that identifies the issuer (financial institution) and the cardholder account. The PAN number is crucial for the identification of the issuer and the specific account within the issuer's systems. PANs are used across various card types including credit, debit, and prepaid cards, and are essential for facilitating electronic financial transactions. As a result of the Data Breach, Plaintiff has suffered, and continues to suffer, injury, including, among other things, costs to cancel and reissue payment cards compromised in the Data Breach, costs associated with the time and expense associated with investigating the Data Breach, costs of fraud monitoring, and costs due to lost interest and transaction fees due to reduced payment card usage.

23.    Defendant Evolve Bank & Trust is an Arkansas chartered bank with its principal place of business located at 301 Shoppingway Boulevard, West Memphis, Arkansas 72301.

24.    Evolve's banking infrastructure enables it to provide services beyond those of traditional banking, including open banking and BaaS services. As such, it is placed in a position of significant responsibility with respect to safeguarding PCD. As alleged herein, Evolve failed to implement reasonable and industry-standard measures to protect that data, leading to the exposure of vast amounts of PCD belonging to customers of Financial Institution Plaintiff and Class Member.

25.    Evolve's responsibilities include, but are not limited to, ensuring compliance with PCI DSS, establishing and maintaining internal safeguards to prevent unauthorized access to stored payment card data, and conducting appropriate oversight of any third-party systems and services. Evolve failed in each of these respects.

26.     As set forth herein, Evolve's inadequate data security infrastructure and disregard for established standards of care directly facilitated the prolonged and unauthorized access to sensitive Payment Card Data over a three-year period.  As a result, financial institutions have incurred substantial costs related to fraud remediation, customer protection, and operational response.

27.     Plaintiff brings this action against Evolve alone, as Evolve is the sole entity responsible for maintaining the systems that were compromised in the breach at issue.  Evolve's negligence and related statutory violations are the direct and proximate cause of Plaintiff and the Class's injuries.

## JURISDICTION AND VENUE

28.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000 exclusive of interest and costs; the proposed class contains well over 100 members; and minimal diversity exists because at least one member of the Class is a citizen of a state different from Defendant Evolve Trust & Bank.

29.     Defendant Evolve is a citizen of Arkansas because it is a bank and trust formed under Arkansas law with its principal place of business in West Memphis, Arkansas.

30.     This Court has personal jurisdiction over Defendant Evolve because it conducts substantial business in Arkansas and where this district is located, has sufficient minimum contacts in Arkansas.

31.     Venue is proper in the United States District Court for the Eastern District of Arkansas under 28 U.S.C. §1391 because a substantial part of the events that gave rise to Plaintiff's claims occurred within this District.

## FACTUAL ALLEGATIONS

### Background on Electronic Debit and Credit Card Transactions and Requirements for Securing Data

32.     Plaintiff and the members of the Class are financial institutions that issue payment cards to their customers and are obligated to reimburse cardholders for fraudulent transactions and to absorb the operational costs of replacing compromised cards.[11]

33.     Evolve offers open banking and BaaS services to third-party financial organizations, including card-issuing programs.   In issuing payment cards, Evolve collects, processes, and stores sensitive PCD.

34.     Due to the nature of these activities, Evolve owed a duty to Plaintiff and the Class to implement and maintain reasonable security measures to protect PCD from unauthorized access, disclosure, and exfiltration.

35.     PCD is highly valuable to cybercriminals, who routinely exploit security weaknesses in payment environments.   High-profile breaches at Equifax, Home Depot, Target, Wawa, Ticketmaster, and other entities illustrate the magnitude of risk and the significant remediation costs borne by financial institutions.

36.     At all relevant times, Evolve knew or should have known that it was a prime target for cyber-attacks.   Industry guidance, including alerts from the PCI Security Standards Council and publications from the FTC, emphasized the need for robust security controls, continuous monitoring, and strict adherence to PCI DSS requirements.

37.     Despite this knowledge, Evolve failed to deploy basic security safeguards, such as encryption of stored card data, network segmentation, timely patch management, multi-factor

---

[11]     These cards include, for example, debit or credit cards branded with the Visa, MasterCard or the Discover logo.

authentication, and vendor oversight, each of which is mandated or strongly recommended under PCI DSS and Section 5 of the FTC Act.

38.    The Data Breach has forced Plaintiff and Class members to: (a) reissue vast numbers of payment cards; (b) enhance and prolong fraud-monitoring programs; and (c) expend significant staff time communicating with affected customers and regulatory bodies.

39.    The foreseeable and direct result of Evolve's conduct is tens of millions of dollars in remediation expenses borne by financial institutions. These costs would have been avoided had Evolve complied with industry standards and exercised reasonable care in protecting PCD.

40.    The PCI DSS is a comprehensive framework of information security requirements developed by the Payment Card Industry Security Standards Council. These requirements apply to all entities that store, process, or transmit cardholder data. The PCI DSS list is designed to ensure that all companies maintain a secure environment to protect payment card data from unauthorized access and misuse.

41.    The 12 requirements of the PCI DSS are:

**Build and Maintain a Secure Network**

1)    Install and maintain Network Security Controls

2)    Apply Secure Configurations to All Systems

**Protect Account Data**

3)    Protect Stored Account Data

4)    Protect Cardholder Data with Strong Cryptology During Transmission Over Open, Public Networks

**Maintain a Vulnerability Management Program**

5)    Protect All Systems and Networks from Malicious Software

6)    Develop and Maintain Secure Systems and Software

**Implement Strong Access Control Measures**

7)    Restrict Access to System Components and Cardholder Data by Business Need to Know

8)    Identify Users and Authenticate Access to System Components

9)    Restrict Physical Access to Cardholder Data

**Regularly Monitor and Test Networks**

10)   Log and Monitor All Access to System Components and Cardholder Data

11)   Test Security of Systems and Networks Regularly

**Maintain an Information Security Policy**

12)   Support Information Security with Organizational Policies and Programs.[12]

42.    PCI DSS v4.0.1 imposes heightened obligations on entities that store, process, or transmit cardholder data, requiring them to use strong encryption, regularly assess risks, and implement robust authentication and access controls. Evolve's failure to comply with these obligations, including its failure to encrypt cardholder data, monitor system access, and minimize unnecessary data retention, constitutes a clear violation of PCI DSS.

---

[12]    *PCI DSS Quick Reference Guide: Understanding the Payment Card Industry Data Security Standard version 4.0.1*, PCI SECURITY STANDARDS COUNCIL (June 2024), https://docs-prv.pcisecuritystandards.org/PCI%20DSS/Standard/PCI-DSS-v4_0_1.pdf (last visited February 12, 2026).

43.     For example, Requirement 3.2 mandates that stored account data be kept to a minimum, retained only as long as necessary for legal or business purposes, and regularly purged. Evolve's failure to implement appropriate data retention and deletion protocols contributed directly to the scope of the breach.

44.     Requirement 8 of PCI DSS requires multi-factor authentication ("MFA") for all administrative access to systems handling cardholder data.  Evolve failed to implement MFA, thereby enabling unauthorized actors to gain prolonged and unchecked access to sensitive systems.

45.     PCI DSS also mandates that covered entities log and monitor access to systems that store or transmit cardholder data, per Requirement 10. Evolve failed to detect the ongoing intrusion for many months, demonstrating a lack of basic logging, alerting, and threat detection capabilities.

46.     These deficiencies collectively reflect Evolve's systemic failure to follow well-established data security norms and regulatory standards.  By disregarding these obligations, Evolve directly enabled the theft of massive quantities of PCD and exposed financial institutions to widespread, preventable harm.

47.     In sum, Evolve's non-compliance with PCI DSS requirements not only facilitated unauthorized access to sensitive PCD but also violated industry standards to prevent precisely the type of breach that occurred.  Evolve's failure to implement, monitor, and enforce appropriate data security practices has caused substantial financial harm to Plaintiff and the Class and will continue to do so.

### The Data Breach

48.     In a notification filed with regulators dated July 8, 2024, Evolve disclosed that its systems were compromised, and that an unauthorized actor gained access to its network in

12

February and May of 2024.[13]  Subsequent information, including CAMS alerts issued by Visa, reflect that the exposure window exceeded what Evolve reported, ***November 5, 2021 through May 31, 2024***.

49.    Evolve further indicated that while the unauthorized parties had access to Defendant's computer systems, they were able to access and exfiltrate customer information.[14]

50.    As such, Evolve's own notice of the Data Breach confirms that the Data Breach was a successful targeted attack, during which cybercriminals were able to steal sensitive PCD.

**Evolve Collects Extensive Payment Card Data and Knew a Breach was Foreseeable**

51.    Plaintiff and Class members, who, as issuing financial institutions, ultimately bear the costs of card fraud, reasonably relied on Evolve's express and implied representations that it would maintain PCI DSS-compliant security controls to protect the PCD it processed on their customers' behalf.

52.    Despite these assurances, Evolve failed to implement and enforce reasonable security measures, including (a) strong encryption for cardholder data; (b) MFA for privileged system access; (c) continuous logging and intrusion detection; and (d) routine data-retention purges. These omissions created, and ultimately realized, an unreasonable risk of unauthorized access.

53.    The rapidly escalating frequency of payment-card data breaches placed Evolve on heightened notice that its environment was a prime target for threat actors.  Industry reports repeatedly warn entities of the severe financial consequences that follow lapses in data security.

---

[13]     *Notice of Data Breach*, STATE OF CALIFORNIA DEPARTMENT OF JUSTICE, https://oag.ca.gov/system/files/U.S.%20Individual%20Notice%20_%20Template%20%2807%2008%2024%29.pdf (last accessed February 11, 2026).
[14]     *Id.*

54.     PCD is a lucrative commodity on underground markets.  Stolen card records command premium prices because they can be used to manufacture counterfeit cards, fund large, unauthorized purchases, or facilitate account-takeover schemes.  Consequently, entities like Evolve, that routinely handle PCD, know, or should know, that even a brief lapse in controls can expose millions of dollars in potential fraud losses for issuing banks.

55.     Publicly available data further confirms the magnitude of the threat.  Thousands of data breaches are publicly disclosed each year, exposing millions of sensitive records; the majority of these incidents involve financially motivated attacks directed at companies who collect, store, and/or process sensitive information such as PCD.

56.     Given its role, Evolve was uniquely positioned to appreciate and mitigate the catastrophic downstream impact a breach would have on financial institutions.  Yet Evolve ignored clear regulatory guidance, failed to invest in adequate safeguards, and left card issuers to shoulder the resulting fraud, card-reissuance, monitoring, and operational costs.  Evolve's conscious disregard of well-known industry standards and regulatory directives constitute negligent, and, under the FTC Act and PCI DSS, negligent *per se*, conduct that directly and proximately caused the injuries suffered by Plaintiff and the Class.

57.     PCD has considerable value and constitute an enticing and well-known target to hackers.  Hackers easily can sell such stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[15]

---

[15]     Brian Krebs, *The Value of a Hacked Company*, KREBS ON SECURITY (July 14, 2016, 10:47 AM), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

58.    "Personal Data is currency in the Information Age and is being traded to the tune of billions of dollars globally – and increasing each year as the more personal data analyzed, categorized and linked."[16]

59.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S.  According to the Identity Theft Resource Center ("ITRC"), in just the third quarter of 2024, there were 672 reported data breaches in the United States, putting the year on track to see nearly as many breaches as occurred in the record-high year of 2023.[17] More than 241 million individuals' data reportedly were exposed in those breaches (again – just in the third quarter of 2024).[18]  The IRTC reported that approximately 549 of the 672 data breaches in the quarter were the result of cyberattacks.[19]

60.    The breadth of data compromised in Data Breach makes the information particularly valuable to thieves and leaves the customers of Plaintiff and Class members especially vulnerable to credit card fraud.

61.    Cybercriminals can use stolen payment card information to create counterfeit payment cards and make unauthorized charges or withdrawals that can cause consumers to incur significant financial losses.  Indeed, the counterfeit payment cards (or the compromised payment card information itself) can be used to purchase high-ticket goods or gift cards that can then be

---

[16]    *The Value of Personal and Private Data*, DIGITAL CONTROL ROOM, https://web.archive.org/web/20250424004036/https://www.digitalcontrolroom.com/the-value-of-personal-and-private-data/ (archived April 24, 2025).
[17]    *Supply Chain Attacks Roar Back in Q3; Mega-Breaches Drive Increase in Victims*, IDENTITY THEFT RESOURCE CENTER (2024), https://www.idtheftcenter.org/wp-content/uploads/2024/10/ITRC-Q3-2024-Data-Breach-Analysis-1.pdf.
[18]    *Id.*
[19]    *Id.*

sold for cash all while charging the consumer's original card. Cybercriminals can also sell stolen payment card information to other cybercriminals on the dark web. In turn, when a payment card is fraudulently used, it can damage the cardholder's credit score, making it difficult to obtain new credit in the future.

62. Following several high-profile data breaches in recent years, including those involving Target, Home Depot, Wendy's, Equifax, Wawa, and Ticketmaster. Evolve was on notice of the very real risk that hackers could exploit vulnerabilities in its data security.

63. Defendant also knew or should have known the importance of safeguarding the PCD with which it was entrusted and of the foreseeable consequences if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of PCD from occurring.

**Evolve Failed to Comply with FTC Guidelines and Industry Standards of Care as to Data Security**

64. Evolve was entrusted with handling vast quantities of PCD is subject to binding obligations under both federal regulatory frameworks and industry-maintained data security standards.

65. These include compliance with Section 5 of FTC Act, which prohibits unfair or deceptive acts or practices in commerce, and adherence to the PCI DSS.

66. Under Section 5 of the FTC Act, entities engaged in the collection, storage, or processing of sensitive consumer information are required to implement reasonable and appropriate security measures to safeguard that information from unauthorized access or theft.

67.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.[20]

68.     In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[21]  The guidelines recommend that businesses implement the following:

     a.     Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

     b.     Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

     c.     Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

     d.     Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

     e.     Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[22]

---

[20]     *Start with Security: A Guide for Business*, FEDERAL TRADE COMMISSION (June 2015), https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[21]     *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct.                    2016),                    https://www.ftc.gov/business-guidance/resources/ protecting-personal-information-guide-business.

[22]     *Id.*

69.     In another publication, the FTC recommended that companies not maintain sensitive information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

70.     Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act.  Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. *See, e.g., FTC v. Wyndham Corp.*, 799 F.3d 236, 240 (3d Cir. 2015).

71.     Defendant's failure to employ reasonable and appropriate measures to protect PCD constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

72.     Accordingly, Evolve's conduct constitutes both common law negligence and negligence *per se*, as Plaintiff and the Class were within the class of entities the FTC Act and PCI DSS are designed to protect, and the injuries they suffered, fraudulent transactions, card replacement, increased monitoring, and operational disruptions, are the very harm those frameworks seek to prevent.

**FI Plaintiff Has Been, and Will Continue to Be, Harmed by the Evolve Data Breach**

---

[23]     *See Start with Security: A Guide for Business, supra* n. 14.

73.     The Data Breach has inflicted substantial and ongoing financial harm on Plaintiff and members of the Class.  As financial institutions, Plaintiff and the Class were forced to act immediately to contain fraud, mitigate exposure, and re-secure affected accounts following the unauthorized access and exfiltration of PCD from Evolve's computer systems.

74.     Specifically, Plaintiff and other financial institutions have had to: (a) cancel and reissue compromised payment cards; (b) investigate and respond to reports of fraudulent activity on those cards; (c) enhance fraud monitoring efforts for affected accounts; (d) provide customer support and notification; and (e) absorb losses stemming from lost interest, transaction fees, and decreased cardholder usage.  These actions have imposed significant operational costs and resource burdens.

75.     Additionally, debit and credit cards compromised as a result of the breach, including the account number printed on the face of the cards, were devalued.  The exposure of this information undermines consumer trust in the affected cards, requiring institutions to replace cards even in the absence of confirmed fraud to maintain customer confidence.

76.     These losses are not speculative.  In September 2024, Visa began issuing CAMS alerts to financial institutions, designating Evolve as the source of a significant payment card breach.

77.     These alerts confirmed that card data, including Primary Account Numbers ("PANs") had been compromised.  These alerts enable card-issuing institutions to identify affected accounts and initiate appropriate mitigation procedures.

78.     Plaintiff received an additional CAMS alert from Visa in June 2025.

79.     In total, Plaintiff and Class members have suffered and will continue to suffer damages due to Evolve's failure to safeguard sensitive PCD, including the costs of card

replacement, lost revenue, increased administrative costs, and harm to institutional reputation. These harms are ongoing and expected to persist as stolen card data circulates in criminal marketplaces.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following nationwide class ("Nationwide Class" or the "Class"):

### Nationwide Class

All Financial Institutions in the United States (including its territories and the District of Columbia) whose consumers' PCD was exposed as a result of the Evolve Data Breach.

81.     Excluded from the Class are Defendant Evolve, any entity in which Evolve has a controlling interest, Evolve's officers and directors, the Court and its staff, and any members of their immediate families.

82.     This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

### Rule 23(a)

83.     This action may properly be maintained as a class action and satisfies the requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy.

84.     **Numerosity.**  The members of the Class are so numerous and geographically dispersed that joinder would be impracticable.  The number of Class members exceeds 100.  The

exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

85.    **Commonality and Predominance.**  There are common questions of law and fact that predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

a.    whether Defendant owed a duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and members of the Class when obtaining, storing, using, and managing PCD, including taking action to safeguard such data;

b.    whether Defendant actively mishandled PCD and implemented and maintained data security measures that it knew or should have known were unreasonable and inadequate to protect PCD;

c.    whether Defendant negligently allowed PCD to be accessed, used, or disclosed by third parties;

d.    whether Plaintiff and members of the Class justifiably relied on representations made by Evolve as to its data security practices and the integrity and accuracy of PCD Evolve provided;

e.    whether Plaintiff and members of the Class justifiably relied on representations made by Evolve that it would oversee and protect PCD given to third parties and ensure that such entities maintained adequate data security practices and the integrity and accuracy of the PCD Evolve provided;

  f.  whether Evolve intended that Plaintiff and members of the Class would rely on Evolve's representations as to its data security practices and the integrity and accuracy of information Evolve provided;

  g.  whether Evolve failed to adequately notify Plaintiff and members of the Class that its data systems were breached;

  h.  whether Plaintiff and members of the Class were injured and suffered damages and ascertainable losses;

  i.  whether Evolve actions and inactions failed to provide reasonable security proximately caused the injuries suffered by Plaintiff and members of the Class;

  j.  whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

  k.  whether Plaintiff and members of the Class are entitled to injunctive, equitable, declaratory and/or other relief, and if so, the nature of such relief.

86. **Typicality.** Plaintiff's claims are typical of the claims of the absent class members and have a common origin and basis. Plaintiff and absent Class members are all financial institutions injured by Evolve's Data Breach. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the Evolve Data Breach. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

87.   **Adequacy.**  Plaintiff will fully and adequately assert and protect the interests of the absent Class members and have retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one.  Neither Plaintiff nor its attorneys have any interests contrary to or conflicting with the interests of absent Class members.

### Rule 23(b)(3)

88.   The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

89.   A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable.  Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues.  Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so.  Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

### Rule 23(b)(2)

90.   All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Evolve.  Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests.  Defendant,

through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

91.     Contact information for each Class member, including mailing addresses, is readily available, facilitating notice of the pendency of this action.

## LEGAL CLAIMS
## FIRST CAUSE OF ACTION
### NEGLIGENCE
(On Behalf of Plaintiff and the Class)

92.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-91 above as if fully set forth herein.

93.     Defendant owes a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and members of the Class when obtaining, storing, using, selling, and managing PCD, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class of any breach in a timely manner so that appropriate action can be taken to minimize or avoid losses.  This duty arises from several sources (described below) and is independent of any duty as a result of any contractual obligations.

94.     Evolve has a common law duty to prevent the foreseeable risk of harm to others, including the Plaintiff and the Class.  It was certainly foreseeable to Evolve that injury would result from a failure to use reasonable measures to protect PCD and to provide timely notice that a breach was detected.  It was also foreseeable that, if reasonable security measures were not taken, hackers would steal PCD belonging to hundreds of thousands of individuals whose PCD Evolve collected; thieves would use PCD to make large numbers of fraudulent transactions; financial institutions would be required to mitigate the fraud by cancelling and reissuing the compromised cards and reimbursing their customers for fraud losses; and that the resulting financial losses would be immense.

95.    Evolve assumed the duty to use reasonable security measures as a result of its conduct when collecting, processing, and storing the PCD of Plaintiff's and the Class's customers.

96.    In addition to its general duty to exercise reasonable care, Evolve also had a duty of care as a result of the special relationship that existed between Evolve and the Plaintiff and the Class.  The special relationship arose because financial institutions entrusted Evolve with PCD. Only Evolve was in a position to ensure that its systems were sufficient to protect against the harm to financial institutions from the Data Breach.

97.    Defendant's duty to use reasonable data security measures also arose under Section 5 of FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PCD by businesses such as Evolve.  The FTC's publications and data security breach orders described above further form the basis of Evolve's duty.  In addition, individual states have enacted statutes based upon the FTC Act that also create a duty on the part of Defendant.  Defendant's lax and deficient data security measures, and failure to promptly notify Plaintiff and the Class of the Data Breach constitute unfair practices in violation of the FTC Act.

98.    Defendant's duty to use reasonable care in protecting PCD arose not only as a result of the common law and the statutes described above, but also because it was bound by, and had committed to comply with, industry standards, specifically including duties under PCI DSS.

99.    Defendant breached its common law, statutory, and other duties and thus, was negligent by failing to use reasonable measures to protect Plaintiff's PCD from the hackers who perpetrated the Data Breach and by failing to provide timely notice of the breach.  Upon information and belief, the specific negligent acts and omissions committed by Defendant include, but are not limited to, some, or all, of the following:

a.    failure to protect, store and delete PCD after the time period necessary to authorize the transaction;

b.    failure to implement systems to protect against malware;

c.    failure to comply with industry standards for multi-factor authentication and security of PCD;

d.    failure to maintain adequate firewalls;

e.    failure to track and monitor access to its network and PCD;

f.    failure to limit access to PCD to those with a valid purpose;

g.    failure to encrypt PCD;

h.    failure to adequately staff and fund its data security operations;

i.    failure to use due care in hiring, promoting, and supervising those responsible for its data security operations;

j.    failure to recognize red flags signaling that Defendant's systems were inadequate and that, as a result, the potential for a massive data breach was increasingly likely;

k.    failure to recognize that cybercriminals had infiltrated systems containing PCD and were stealing PCD while the Data Breach was taking place; and

l.    failure to disclose the Data Breach in a timely manner.

100.    In connection with the conduct described above, Defendant acted wantonly, recklessly, and with complete disregard for the consequences.

101.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered, and continue to suffer, injury, including, but not limited to, cancelling and reissuing payment cards, changing or closing accounts, notifying customers that their cards were

compromised, investigating claims of fraudulent activity, increasing fraud monitoring on potentially impacted accounts, and taking other steps to protect themselves and their customers. Plaintiff and the Class also lost interest and transaction fees, due to reduced card usage resulting from the breach, and the cards they issued (and the corresponding account numbers) were rendered worthless.

102.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

103.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-91 above as if fully set forth herein.

104.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Evolve, of failing to use reasonable measures to protect PCD. The FTC publications and orders described above also form part of the basis of Defendant's duty.

105.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and the Class's PCD and failing to comply with applicable industry standards, including PCI DSS, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PCD it obtained (PCD related to millions of individuals) and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to consumers, Plaintiff and the Class.

106.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

107.    Plaintiff and members of the Class are within the class of persons that Section 5 of the FTC Act (and similar state statutes) was intended to protect, as they are engaged in trade and commerce and bear primary responsibility for directly reimbursing consumers for fraud losses. Moreover, many of the Class members are credit unions, which are organized as cooperatives whose members are consumers.

108.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  Indeed, the FTC has pursued over 50 enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by the Plaintiff and the Class.

109.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injury, including, but not limited to, cancelling and reissuing payment cards, changing or closing accounts, notifying customers that their cards were compromised, investigating claims of fraudulent activity,  increasing fraud monitoring on potentially impacted accounts, and taking other steps to protect themselves and their customers. They also lost interest and transaction fees, due to reduced card usage resulting from the breach, and the cards they issued (and the corresponding account numbers) were rendered worthless.

110.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### DECLARATORY AND INJUNCTIVE RELIEF

**(On Behalf of Plaintiff and the Class)**

111.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1-91 above as if fully set forth herein.

112.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious, and which violate the terms of the federal and state statutes described herein.

113.    An actual controversy has arisen in the wake of the Data Breach regarding its common law and other duties to reasonably safeguard PCD.  Plaintiff alleges that Defendant's data security measures were inadequate and remain inadequate.  Plaintiff anticipates that Defendant will deny these allegations.  Furthermore, Plaintiff continues to suffer injury as additional compromised payment cards are identified and need to be reissued and as fraudulent charges are made on payment cards they issued to their customers.

114.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.    Defendant continues to owe a legal duty to secure the PCD it collects, stores, and processes and to notify financial institutions of a data breach under the common law, Section 5 of the FTC Act, PCI DSS standards, its commitments, and various state statutes;

   b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure PCD; and

   c.    Defendant's ongoing breaches of its legal duty continue to cause Plaintiff and the Class harm.

115.    The Court also should issue corresponding injunctive relief requiring Defendant to employ adequate security protocols, consistent with industry standards, to protect PCD. Specifically, this injunction should, among other things, direct Defendant to:

      a.    utilize industry standard encryption to require multi-factor authentication for Defendant's computer systems;

      b.    require that PCD be encrypted at all other times;

      c.    require that Defendant only maintain PCD for a limited time where it has an ongoing need to use such data;

      d.    require Defendant to delete all historical PCD that it possesses;

      e.    engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

      f.    audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

      g.    regularly test its systems for security vulnerabilities, consistent with industry standards;

      h.    comply with all PCI DSS standards pertaining to the security of its customers' personal and confidential information; and

      i.    install all upgrades recommended by manufacturers of security software and firewalls used by Defendant.

116.    If an injunction is not issued, Plaintiff will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Evolve.  The risk of another such breach is real, immediate, and substantial.  If another breach at Evolve occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified,

and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for out-of-pocket damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable and reputational damage.

117. The hardship to Plaintiff and the Class, if an injunction is not issued, exceeds the hardship to Defendant, if an injunction is issued. Among other things, if another massive data breach occurs at Evolve, Plaintiff and members of the Class will likely incur hundreds of millions of dollars in damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

118. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Evolve, thus eliminating the injuries that would result to Plaintiff, the Class, and the millions of consumers whose confidential information would be compromised.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
#### (On Behalf of Plaintiff and the Class)

119. Plaintiff restates and realleges the allegations contained in paragraphs 1-91 above as if fully set forth herein.

120. Plaintiff and Class members conferred a monetary benefit on Defendant by directly and/or indirectly providing them with their valuable PCD.

121. Defendant knew that Plaintiff and Class members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PCD entrusted to it.

122.   Defendant profited from Plaintiff's and Class members' PCD and use of Plaintiff's and Class members' PCD for business purposes.

123.   Defendant failed to secure Plaintiff's and Class members' PCD and, therefore, did not fully compensate Plaintiff or Class members for the value that their PCD provided.

124.   Defendant acquired Plaintiff's and the Class's PCD through inequitable record retention as Defendant failed to disclose the inadequate data security practices previously alleged.

125.   If Plaintiff and Class members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PCD, they would not have agreed to the entrustment of their PCD to Defendant.

126.   Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class members conferred upon Defendant.

127.   Plaintiff and Class members are without an adequate remedy at law.

128.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered injuries, including those identified above.

129.   Plaintiff and Class members are entitled to restitution and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as return of their sensitive PCD and/or confirmation that it is secure.  This can be accomplished by establishing a constructive trust from which the Plaintiff and Class members may seek restitution or compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully request that the Court:

A.    Certify the Class and appoint Plaintiff and Plaintiff's counsel to represent the Class;

B.    Enter a monetary judgment in favor of Plaintiff and the Class to compensate them for the injuries they have suffered and will continue to suffer, together with pre-judgment and post-judgment interest and treble damages and penalties where appropriate;

C.    Enter a declaratory judgment as described herein and corresponding injunctive relief requiring Defendant to employ adequate data security protocols consistent with industry standards to protect PCD;

D.    Grant the injunctive relief requested herein;

E.    Award Plaintiff and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and

F.    Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 25, 2026                Respectfully submitted,

_____

Joseph Henry (Hank) Bates, III (ABN 98063)
Randall K. Pulliam, (ABN 98105)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
hbates@cbplaw.com
rpulliam@cbplaw.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice forthcoming*)
Anja Rusi (*pro hac vice forthcoming*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
arusi@scott-scott.com

*Attorneys for Plaintiff*